AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of  )
*(Briefly describe the property to be searched or identify the person by name and address)*  )
Information Associated with One Target Account, more fully described in Attachment A  )

Case No.    MJ22-528

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, attached hereto and incorporated herein by reference.

located in the        Northern        District of        California        , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(i)–(iii), (v)(I) and (a)(2)(B)(ii); and 18 U.S.C. §§ 1956(a)(1) and (h) | Bringing in and Harboring Certain Aliens for Profit; and Laundering of, and Conspiracy to Launder, Monetary Instruments |

The application is based on these facts:

✓ See Affidavit of SA David J. Spitzer, HSI, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

David Spitzer, Special Agent, HSI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:        10/28/2022

_____
*Judge's signature*

City and state:  Seattle, Washington

Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

USAO: 2018R00962

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

STATE OF WASHINGTON      )

                                )      ss

COUNTY OF KING           )

I, David Spitzer being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with United States Homeland Security Investigations (HSI) and have been so employed since January 2020. In February 2021, I graduated from the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia. While at FLETC, I received nearly 1000 hours of training in such areas including, but not limited to criminal law, human smuggling/trafficking investigations, and criminal procedures. Prior to being employed with HSI, I was employed as an agent with the United States Border Patrol (USBP) for eleven years and was assigned to the Sector Intelligence Units in El Centro, CA, and Blaine, WA. In this capacity, I was responsible for conducting criminal investigations regarding the violation of immigration laws of the United States. In 2009, I graduated from the United States Border Patrol Academy at the FLETC in Artesia, New Mexico. My education includes a Bachelor of Arts degree in Political Science and a Bachelor of Arts degree in Criminology from the University of Florida.

2.      I am assigned to HSI's National Security and Public Safety group in Blaine, WA (hereinafter "HSI Blaine"), which focuses on the enforcement of immigration laws (Title 8, United States Code), including human trafficking and human smuggling, as well as the investigation of transnational gangs. I am authorized to investigate and enforce violations of federal criminal statutes, including those in Titles 8, 18, and 21 of the United States Code.

3.      I make this affidavit in support of an application for a search warrant for information associated with the email address, **iknaamtransport@gmail.com** that is stored at the premises controlled by Google LLC (hereinafter the "**TARGET ACCOUNT**"). Google LLC ("Google") is an electronics communications service accepting process at 1600 Amphitheatre Parkway, Mountain View, California 94043.

4.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), 2 703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachments B, government authorized persons will review that information to locate the items described in Section II of Attachments B.

5.      The information in this affidavit is based upon, among other things, the investigation that I have conducted in this case, my training and experience, information from other agents and witnesses, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation, When the statements of others are set forth in this affidavit, they are set forth in substance and in part.

6.      Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 8 U.S.C. §§ 1324(a)(1)(A)(i)-(iii), (v)(I) and (a)(2)(B)(ii), Bringing in and Harboring Certain Aliens[1], and Conspiracy to

---

[1] The word "alien" is used in Title 8 of the United States Code. Throughout this affidavit, and consistent with Executive Branch policy, when referencing offenses as defined in Title 8 of the United States Code, the author uses the term "alien," when not referring specifically to Title 8 of the United States Code, the term "noncitizen" is used in lieu of the term "alien."

AFFIDAVIT OF DAVID SPITZER - 2
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

commit such offenses, and 18 U.S.C. §§ 1956(a)(1), and (h), Laundering of, and Conspiracy to Launder, Monetary Instruments (hereinafter referred to collectively as "Target Offenses"), will be found in the **TARGET ACCOUNT.**

7.     This warrant is being submitted via electronic means pursuant to local Criminal Rule CrR 41(d)(3).

## JURISDICTION

8.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigation." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND ON UNDOCUMENTED NONCITIZEN SMUGGLING ORGANIZATIONS

9.     I know from training and experience that 8 U.S.C. § 1324(a)(1)(A)(i) makes it illegal to bring, or attempt to bring, an undocumented noncitizen to the United States in any matter whatsoever other than at a designated port of entry or a place other than as designated by the Secretary of the Department of Homeland Security. I also know that this section applies regardless of whether an undocumented noncitizen has received prior official authorization to come to, enter, or reside in the United States.

10.     I also know that under 8 U.S.C. § 1324(a)(1)(A)(ii) it is illegal to knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, to transport, or attempt to transport, such alien in order to help the alien remain in the United States illegally.

11.     In addition, I know that under 8 U.S.C. § 1324(a)(1)(A)(iii) it is illegal to knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, to harbor, or attempt to harbor, such alien, with the intent to violate the law.

AFFIDAVIT OF DAVID SPITZER - 3
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

12.     I further know that under 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (II) it is unlawful to conspire to commit, or aid or abet the commission of the crimes listed in 8 U.S.C. §§ 1324(a)(1)(A)(i)-(iii).

13.     Finally, I know that under 8 U.S.C. § 1324(a)(2)(B)(ii) it is illegal to knowingly or in reckless disregard of the fact that an undocumented noncitizen has not received prior official authorization to come to, enter, or reside in the United States, bring or attempt to bring to the United States whatsoever, such alien for private financial gain.

14.     From my training and experience as an HSI Special Agent, I know that undocumented noncitizens who cannot secure non-immigrant or immigrant visas to lawfully enter the United States generally choose instead to enter the United States illegally[2] between the ports of entry on the southern and northern borders.

15.     Because of their general unfamiliarity with the terrain and border environment or with the methods and routes used to successfully cross the border without detection by government officials, undocumented noncitizens seeking to enter the United States without inspection frequently hire individuals, known as smugglers, who have experience bringing individuals into the United States without detection.

16.     Several undocumented noncitizen smuggling organizations operate in the lower mainland of British Columbia, Canada. These organizations typically charge undocumented noncitizens between $2,000 and $5,000 (USD) to be illegally brought across the U.S. border. Fees charged by these organizations vary on different factors. This can include if an undocumented noncitizen is housed by the organization during their illegal border crossing, or if the organization transports the undocumented noncitizen a significant distance during the illegal entry. The relative risk of the route used to enter the U.S. is also a factor that can affect the fee.

---

[2] As used here, and throughout this affidavit, an illegal entry into the United States means an entry at a place not designated as a port of entry and without required immigration documents.

AFFIDAVIT OF DAVID SPITZER - 4
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

17.     Undocumented noncitizen smuggling organizations operating in the lower mainland of British Columbia typically have U.S. associates who pick up the undocumented noncitizens once they cross the border illegally. These U.S. associates typically transport the undocumented noncitizens to the Seattle area, where associates may then assist the undocumented noncitizens with travel arrangements to other U.S. locations. These undocumented noncitizen smuggling organizations may assist in facilitating a driver to transport undocumented noncitizens to other states, as many illegal entrants lack the identification required to travel by air or other mass transportation.

18.     Many of these undocumented noncitizen smuggling organizations work with individuals known as "brokers", who arrange travel for the undocumented noncitizens from their home countries through various transit nations into the U.S. for fees ranging from $30,000 to $70,000 (USD). These brokers will often also arrange for fraudulent travel and identification documents to facilitate the undocumented noncitizen's travel.

## SUMMARY OF THE INVESTIGATION

19.     In 2018, Homeland Security Investigations (HSI) Blaine began investigating a noncitizen smuggling organization that was suspected of smuggling noncitizens into the United States through the U.S. – Canada border in Whatcom County, Washington. Through this investigation, investigators have determined that beginning no later than Summer 2018, the smuggling organization used Uber drivers to transport undocumented noncitizens from the U.S. – Canada border to various locations in the greater Seattle area.

21.     Based upon records provided by Uber, investigators observed a pattern associated with the Uber trips involving the transportation of noncitizens that were being smuggled by the organization. Specifically, investigators noted that the Uber trips would consist of two legs. The first leg of the trip would originate from near the U.S. – Canada border and would terminate at an intermediate location—most often the Seattle-Tacoma International Airport. The second leg would then commence from the vicinity of the prior

AFFIDAVIT OF DAVID SPITZER - 5
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

drop-off location and would terminate near a suspected stash house in Kent, WA, at a strip mall parking lot in Lacey, WA, or at motels in the greater Seattle-area.

22.     Of note, Daljit KAUR—GILL's spouse—is the owner of a house located at 2743 Fiddleback St. NE, Lacey, WA (hereafter "the Lacey Residence"), which was used by GILL to house smuggled noncitizens prior to further transportation to an ultimate destination—most often in the greater Chicago, Illinois area.

23.     Specifically, in July 2021, August 2021, and September 2021, via video and/or in-person surveillance, GILL was observed dropping off smuggled noncitizens at a gas station in Lacey, WA (July 2021), or picking-up smuggled noncitizens and transporting them back to the Lacey Residence (August and September 2021).

24.     Moreover, in the days prior to the July 2021 smuggling event, investigators located multiple split Uber trips that originated near the U.S. – Canada border and terminated in Lacey, WA. For the smuggling events in August and September 2021, investigators conducted surveillance of the Uber trips while in progress.

25.     In addition to being the owner of the Lacey Residence—which was used by GILL as a stash house for smuggled aliens—KAUR is also the president/CEO of the commercial freight company Iknaam Transport, Inc. ("Iknaam Transport"). Investigators believe that illicit proceeds of the smuggling conspiracy have been desposited into the main operating account of Iknaam Transport—Bank of America Account Number ending in -1219[3] (hereafter "Iknaam Acct -1219")—in an effort to make these illicit proceeds appear as legitimate income obtained from Iknaam Transport's commercial shipping business.[4]

---

[3] Based upon records provided by Bank of America, this account was opened on July 9, 2015, by Daljit KAUR at the Bank of America Laguna Reserve branch in Elk Grove, California. According to Bank of America records, Daljit KAUR has been the only signaturoy on the account since account opening.

[4] The Court should be aware that during his post-arrest statement to law enforcement on May 24, 2022, GILL was adamant that no smuggling proceeds had been deposited into Iknaam Acct -1219. GILL explained that most of the proceeds that he received were paid in cash. He further stated that the total proceeds that he had received during his participation in the conspiracy were approximately $400,000 - $500,000. GILL explained that he spent some of this money in the United States, but the majority of these proceeds had been sent to India to pay liens on properties owned by GILL in India.

AFFIDAVIT OF DAVID SPITZER - 6
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

26.     For example, during the month of September 2021—when GILL was surveilled with multiple loads of smuggled noncitizens—there were $138,686.32 in total deposits to Iknaam Acct -1219. While some of these deposits may relate to legitimate commercial shipping income, several appear to be the illicit proceeds of human smuggling. Specifically, investigators noted a $9,900[5] cash deposit on September 4, 2021, that was made at a Bank of America branch in Seminole, Florida. Additionally, from September 1, 2021, through September 14, 2021, there were eleven deposits—totaling $56,500—that were credited to Iknaam Acct -1219[6]. These eleven deposits were all in round-dollar amounts ranging from $4,000 - $6,500, *i.e.*, amounts consistent with the fees ($2,500 – $4,000, plus expenses) that GILL himself acknowledged charging during his post-arrest interview on May 24, 2022[7].

27.     Records provided by Bank of America and Capital One also demonstrate that Iknaam Acct -1219 has been used to pay expenses associated with the organization's human smuggling activities.

28.     Specifically, in March 2022, investigators located a Capital One credit card (hereafter "the Capital One credit card") that GILL was using in furtherance of the smuggling scheme. Specifically, a Capital One credit card in the name of "Jaipaul Singh," with a billing address of 10074 Dona Neely Way, Elk Grove, CA (hereafter "the Elk Grove residence"), was repeatedly used to purchase airfare for individuals that GILL had smuggled into the United States.

---

[5] Based upon my training and experience, I believe that this deposit was made for this amount to avoid the triggering of a currency transaction that the bank would have been required to file if the deposit had been $10,000 or more. *See* 31 CFR 1010.300, *et seq*.

[6] A review of several of the check images provided by Bank of America showed that the endorsement on the back of the check was to "Iknaam Investments, LLC XXXX XXX 9563." Daljit KAUR is also the sole account holder for this account. These checks are all made payable to Iknaam Transport, and despite the endorsement, a review of bank statements shows that these checks were all credited to Iknaam Acct -1219.

[7] A review of records provided by Bank of America indicates that several of these deposits were made in duplicate. Although there are multiple deposits that appear to be crediting the same check to Iknaam Acct -1219, there is no subsequent transaction that shows that the duplicate amount was refunded to remitter of the check, or the bank reversed any credit related to a duplicate transaction. Despite the fact that there appear to be duplicate transactions, the duplicate transactions were all credited to Iknaam Acct -1219.

AFFIDAVIT OF DAVID SPITZER - 7
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

29.     Investigators located split Uber trips on both January 25, 2022, and January 26, 2022, that appear to correlate with these flights. Specifically, the first leg of each trip originated in the early morning hours near the U.S. – Canada border and was split at the Seattle-Tacoma International Airport (hereinafter "Sea-Tac Airport"). After the trip was split a Sea-Tac Airport, the second leg of the trip continued to the Century Motel in Kent, WA. Later in the same day, investigators then noted an apparent third leg of the trip from the Century Motel back to the Sea-Tac airport.

30.     Based upon recorded communications between GILL and an HSI cooperating source (referred to in prior applications and herein as "CS-2" [8]), investigators confirmed that GILL smuggled K.P. and J.C. into the United States as indicated above. According to these recorded communications, GILL's fee for smuggling these two individuals into the United States was $11,000 per person / $22,000 total.

31.     Records obtained from Capital One Bank show that from January 2021, through May 2022, Iknaam Acct -1219 made 104 payments to this Capital One credit card account. The total amount of these payments was $83,330.14.

32.     As explained in greater detail below, during the time that Iknaam Acct -1219 was being used to make payments to the Capital One credit, GILL had access to, and/or control of the **TARGET ACCOUNT**.

---

[8] CS-2 has been an HSI source of information, and later a confidential informant, since Summer 2021. CS-2 was previously identified as a target of this investigation and some of his/her activities in support of the smuggling organization are detailed in this affidavit. CS-2 is cooperating with the government in the hope of receiving prosecutorial consideration. CS-2 has a criminal history related to his/her unlawful entry into the United States. CS-2 is subject to an outstanding order of removal issued by an immigration judge, *in absentia*, under a different and false name that CS-2 had provided to USBP upon his initial apprehension in 2003. Due to his/her cooperation in this investigation, CS-2 was receiving deferred action from HSI. In March 2022, CS-2 was granted an immigration benefit that could ultimately lead to lasting status and relates to an application that was submitted prior to CS-2's involvement with HSI and this investigation. However, his/her prior participation in the smuggling organization's activities could detrimentally affect CS-2's ability to receive a lasting immigration benefit.
CS-2 has not previously been a confidential informant with HSI or any other law enforcement agency. During the time that CS-2 has been cooperating with HSI in this investigation, CS-2 has provided actionable information related to the smuggling organization's activity, which has resulted in several arrests of undocumented noncitizens subsequent to their unlawful entry into the United States. Based on these arrests, and other background information related to subjects of investigation—some of which, but not all of which agents have been able to externally corroborate—the information provided by CS-2 has been shown to be reliable.

AFFIDAVIT OF DAVID SPITZER - 8
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     On May 24, 2022, HSI Blaine and HSI Tacoma agents arrested GILL at the Lacey Residence. In addition to GILL, investigators encountered an undocumented noncitizen that GILL had smuggled into the United States. The noncitizen was being staged at the Lacey Residence prior to the arrangement of further travel within the United States.

## PROBABLE CAUSE

### GILL's Use of TARGET ACCOUNT

34.     On February 11, 2022, an HSI Confidential Source ("CS-1"),[9] contacted GILL via a WhatsApp account[10] (referred to in prior warrant applications and herein as the "TT1 WhatsApp Account").

35.     According to CS-1, during the WhatsApp text exchange, CS-1 and GILL discussed federal taxes. GILL stated to CS-1 that GILL would pay less taxes if GILL generated, for other people, IRS Form 1099—which I know to be used to report contractor expenses to the IRS. GILL informed CS-1 that if he/she knew someone that needed a loan, GILL could provide a Form 1099 to that individual to show that they had sufficient income for the loan. CS-1 indicated that he/she knew someone that could use such proof of income.

36.     GILL asked CS-1 to provide a name, address, and tax identification number for the 1099 that GILL would provide. CS-1 provided the requested information to GILL via the TT1 WhatsApp Account. CS-1 also provided GILL an e-mail address to which GILL should send the completed Form 1099.

---

[9] CS-1 is cooperating with HSI in the hopes of receiving immigration benefits for members of CS-1's family. CS-1 is also cooperating with HSI for potential prosecutorial consideration given his/her concern that he/she would be implicated in the illegal conduct targeted by this investigation. CS-1 has a personal relationship with GILL that could affect his/her objectivity and could provide a basis for CS-1 to not fully disclose all information relating to GILL. CS-1 does not have criminal history. CS-1 has not previously been a confidential informant with HSI or any other law enforcement agency. CS-1 has provided background information on targets of this investigation and documents corroborating the information. The information provided by CS-1 has been corroborated through other means and has been shown to be reliable.

[10] Based upon my training and experience, I know that WhatsApp is an open-source messaging application available on both Android and iPhone smart phones, and Apple and Windows personal computers. I know that the account number for a WhatsApp account must be associated with a cellular telephone number. I also know that to log into a WhatsApp account from another digital device, *i.e.*, that is not associated with the telephone number for the WhatsApp account, a user must have access to the cellular telephone associated with the account for initial login on a new device.

37.     On February 17, 2022, at approximately 3:31 p.m., GILL sent CS-1, via the TT1 WhatsApp Account, an image of a 2021 Form 1099-NEC. The payer's information was listed as: ICON FREIGHT LOGISTICS; 2501 TOLBERT DR; TRACY, CA 95377; (510) 816-5642. According to records provided by the U.S. Department of Transportation, I know that the company president of Icon Freight Logistics is Major Singh, an associate of Daljit KAUR and GILL. The nonemployee compensation listed on the form was $84,912.00.[11]

38.     At 8:13 p.m., CS-1 received an email from the **TARGET ACCOUNT** with a subject line of "GS wala 1099." This subject line is consistent with the full name listed in the Form 1099 that GILL had sent via the TT1 WhatsApp Account earlier in the day. The Form 1099-NEC was attached to the email, and the document was titled ICON FREIGHT LOGISTICS. The only text in the body of the email was, "Thank you Iknaam Transport Inc. Elk Grove, CA 95757 Ph. (510) 816-5642."

39.     According to a March 2021 Small Business Administration Paycheck Protection Program (PPP) loan submitted on behalf of Iknaam Transport Inc., Daljit KAUR is listed as the "CEO" of this company. These same records list the **TARGET ACCOUNT** as the business email address for Iknaam Transport.

**B.      Identification of Capital One Credit Card and Association with Iknaam Acct -1219**

40.     On March 23, 2022, Capital One Bank (USA), N.A., provided records for the Capital One credit card that had purchased airfare for K.P. and J.C., two Indian nationals that GILL had smuggled into the United States in January 2022. As noted, the account holder for this credit card was listed as "Jaipaul Singh," with a listed residence of

---

[11] Based on record checks, it is believed that all names, addresses, and taxpayer identification numbers listed on the 1099-NEC are accurate. However, according to CS-1, in 2021, the listed recipient of the nonemployee compensation, G.S.W., did not provide services of any kind to Icon Freight Logistics.

AFFIDAVIT OF DAVID SPITZER - 10
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  10074 Dona Neely Way, Elk Grove, CA, *i.e.*, the Elk Grove residence where GILL resided
2  prior to his arrest in May 2022.

3      41.    Capital One also provided the phone number listed on the account. An
4  administrative subpoena to Verizon revealed that the subscriber of the phone number listed
5  on this account is Daljit KAUR at the Elk Gove residence.

6  **C.      Use of Capital One Credit Card to Purchase Airfare for Noncitizens**
7  **Smuggled by the Organization**

8      42.    On December 23, 2021, at approximately 3:16 a.m., an Uber account
9  controlled by GILL (referred to in prior warrant applications and herein as Uber Account
10 3), ordered a ride from near the U.S. – Canada border to the Sea-Tac Airport. A subsequent
11 trip-splitting ride, also ordered by Uber Account 3, departed at 5:25 a.m. from the Radisson
12 Sea-Tac, and arrived at the Century Motel at 5:36 a.m. Later that evening, at approximately
13 9:26 p.m., an Uber account controlled by GILL (referred to as Uber Account 5 in prior
14 warrant applications and herein), was used to order a ride from the Century Motel to the
15 Sea-Tac Airport.

16     43.    On December 23, 2021, a United Airlines flight from Seattle, WA, to
17 Newark, NJ, was booked using the Capital One credit card account for two passengers. The
18 credit card statement listed the United Airlines ticket number and the passenger names
19 "PATEL/NIRAV B" and "PATEL/TUSHAR B." The total cost of these two airfares was
20 $746.80.

21     44.    A review of the United Airlines passenger manifest for Flight 2345 with
22 service from Seattle, WA to Newark, NJ, showed two passengers listed as
23 "PATEL/TUSHAR B" and "PATEL/TUSHAR B."

24     45.    On December 24, 2021, at approximately 2:53 a.m., Uber Account 5 ordered
25 a ride from near the U.S. – Canada border to the Sea-Tac Airport. A subsequent trip-
26 splitting ride, ordered by an Uber account controlled by GILL (referred to as Uber Account
27 2 in prior warrant applications and herein), departed from the Radisson Sea-Tac at 5:01

AFFIDAVIT OF DAVID SPITZER - 11
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.m., and arrived at the Kent-Des Moines Park & Ride—which is located approximately 0.2 miles from the Century Motel—at 5:11 a.m. Later that afternoon, at approximately 3:02 p.m., Uber Account 2 ordered a ride from the Century Motel to the Sea-Tac Airport.

46.     On December 24, 2021, an Alaska Airlines flight from Seattle, WA, to Chicago-O'Hare International Airport, was booked using the Capital One credit card account for two passengers. The total cost of these two fares was $540.80. The credit card statement listed the Alaska Airlines ticket number and passenger names "PATEL/PARAS B" and "PATEL/AKSHAYKUMAR J."

47.     A review of the Alaska Airlines passenger manifest for Flight 26 with service from Seattle, WA, to Chicago-O'Hare International Airport showed the passengers listed as "PATEL, PARAS B" and "PATEL, AKSHAYKUMAR J."

48.     Based upon a review of records for Iknaam Acct -1219, I know that on December 27, 2021, and December 28, 2021, a user of this account, suspected of being either GILL or KAUR, made mobile payments to the Capital One credit card account totaling $1,724.78.

49.     On February 2, 2022, at approximately 2:53 a.m., Uber Account 5 ordered a ride from near the U.S. – Canada border to the Sea-Tac Airport. A subsequent trip-splitting ride, ordered by Uber Account 3, departed from the Radisson Sea-Tac at 3:43 a.m., and arrived at the Century Motel at 3:52 a.m. Later that evening, at approximately 9:07 p.m., Uber Account 2 ordered a ride from the Century Motel to the Sea-Tac Airport.

50.     On February 2, 2022, a United Airlines flight from Seattle, WA to Newark, NJ was booked using the Capital One credit card account for two passengers. The total cost of these two fares was $617.20. The credit card statement listed the United Airlines ticket number and passenger names "DARJI/KOMALBEN K" and "DARJI/KIRANKUMAR J."

51.     A review of the United Airlines passenger manifest for Flight 2680 with service from Seattle, WA, to Newark, NJ, showed two passengers listed as "DARJI/KIRANKUMARJ" and "DARJI/KOMALBENK."

AFFIDAVIT OF DAVID SPITZER - 12
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

52.     On February 8, 2022, at approximately 11:51 p.m., Uber Account 5 ordered a ride from near the U.S. – Canada border to the Sea-Tac Airport. A subsequent trip-splitting ride, ordered by the Uber Account 3 on February 9, 2022, departed from the Radisson Sea-Tac at 2:04 a.m., and arrived at the Century Motel at 2:13 a.m. Later that evening, at approximately 9:28 p.m., Uber Account 2 ordered a ride from the Century Motel to the Sea-Tac Airport.

53.     On February 9, 2022, an Alaska Airlines flight from Seattle, WA to Chicago-O'Hare was booked using the Capital One credit card account for one passenger. The total cost of this fare was $270.60. The credit card statement listed the Alaska Airlines ticket number and passenger name "PATEL/DRASTIBEN B."

54.     A review of the Alaska Airlines passenger manifest for Flight 718 with service from Seattle, WA, to Chicago-O'Hare International Airport, showed one passenger listed as "PATEL, DRASTIBEN B."

55.     From January 25, 2022, through February 12, 2022, the Capital One credit card was used to purchase nine other fares, with each leg of the flight originating at Sea-Tac Airport. Eight of these flights had a destination of Chicago O'Hare, and one had a destination of Nashville, TN. The total cost of these nine fares was $2,463.40.

56.     From January 25, 2022, through February 12, 2022, the Capital One credit card was used to send, via World Remit—an international money service business, $3,007.61 to unknown recipients. While the destination of these money transfers is unknown, I know World Remit offers money services between the United State and India.

57.     Based upon a review of records for Iknaam Acct -1219, I know that beginning on January 25, 2022, and continuing through February 14, 2022, a user of this account, suspected of being either GILL or KAUR, made ten mobile payments to the Capital One credit card account totaling $9,914.45.

//

//

AFFIDAVIT OF DAVID SPITZER - 13
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

58.     Based upon the above, I believe that both Iknaam Acct -1219 and the Capital One credit card account, were used by GILL, KAUR, and/or unknown individuals, in furtherance of the noncitizen smuggling conspiracy.

**E.      Purchase of Uber Gift Cards After Cash Withdrawals from Iknaam Acct -1219**

59.     Based on records provided by Uber, on March 29, 2022, a purchase of two Uber gift cards totaling $350 was made in cash at a Rite Aid located at 10570 Twin Cities Road, Galt, CA (hereinafter "the Galt Rite Aid"). Based upon a review of Bank of America records, investigators know that on March 23, 2022, at the Bank of America, Laguna Reserve branch, located in Elk Grove, CA, $1,000 in cash was withdrawn via ATM from Iknaam Acct -1219.

60.     The first gift card purchased in Galt, CA, on March 29, 2022, was redeemed by Uber Account 3 during a smuggling event detailed below.

61.     On April 15, 2022, at 4:33 p.m., Uber Account 3 requested the first leg of a split trip ride, both ordered by Uber Account 3. This first leg originated from Cornwall Avenue in Bellingham, WA, at 4:34 p.m. and ended in Everett, WA, at 6:29 p.m. Based on location data from Uber, the location of the destination in Everett was a Kentucky Fried Chicken restaurant. The second leg of the split-trip, also ordered by Uber Account 3, departed just behind the same restaurant at 6:40 p.m. and arrived at the Century Motel in Kent, WA at 7:25 p.m.

62.     The second gift card that was purchased on March 29, 2022, at the Galt Rite Aid was redeemed on April 16, 2022, at 1:31 a.m. by the user of Uber Account 3. This gift card redemption also corresponds to another suspected human smuggling event that occurred shortly thereafter.

63.     On April 16, 2022, at approximately 2:48 a.m., Uber Account 3 requested the first leg of a trip-splitting ride that originated from near the U.S. – Canada border. This

AFFIDAVIT OF DAVID SPITZER - 14
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

trip originated at 3:16 a.m., near 2855 Whitewood Drive in Custer[12] and arrived at Sea-Tac Airport at 5:15 a.m. The second leg of the split-trip, ordered by an Uber Account controlled by GILL (referred to as Uber Account 1 in prior warrant applications and herein), departed the Radisson Sea-Tac at 5:31 a.m. and at 6:21 a.m. arrived at 2727 Fiddleback Street NE, Lacey, WA. This location is three houses away from the Lacey Residence.

64.     According to Uber records, on April 21, 2022, at 12:54 a.m., Uber gift cards in the amount of $150 and $200 were purchased at a Walgreens in Elk Grove, CA. Based upon a review of Bank of America records, investigators know that on April 22, 2022, at the Bank of America, Laguna Reserve branch, located in Elk Grove, CA, $1,000 in cash was withdrawn via ATM from Iknaam Acct -1219.

65.     According to Uber records, these gift cards were credited to Uber Account 3 at 2:15 a.m. and 2:17 a.m. later that morning. Uber records further confirmed that at 2:59 a.m., Uber Account 3 ordered a fare with an origination near where the three noncitizens were apprehended with an intended destination of Sea-Tac Airport.

66.     On May 6, 2022, investigators obtained video surveillance from a Walgreens located at 7299 Laguna Blvd, Elk Grove, CA (hereinafter "the Elk Grove Walgreens"), where the Uber gift cards that were redeemed to Uber Account 3 were purchased. According to that surveillance video,[13] the person who purchased these Uber gift cards paid for them in cash. Based upon a post-arrest interview of GILL, investigators confirmed that the individual purchasing the Uber gift cards, and depicted in the picture below, is GILL.

//

//

//

//

---

[12] As discussed later in this affidavit, this was the exact location of a ride ordered by Uber Account 3, in which three undocumented noncitizens were apprehended by U.S. Border Patrol agents on April 21, 2022,

[13] For reasons that are unknown to investigators, the timestamp on the Walgreens' surveillance video appears to be off (later) by one hour.

AFFIDAVIT OF DAVID SPITZER - 15
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7



8   67.     According to records obtained from Uber, gift cards in the amounts of $100,

9   $200, and $200 were purchased at the Elk Grove Walgreens on April 22, 2022, at 2:14 a.m.

10  According to Uber records, two of these gift cards were credited to Uber Account 2 at 3:26

11  a.m. and 3:27 a.m. later that morning. The third $200 gift card was credited to Uber

12  Account 1 at 6:22 a.m. on April 22, 2022.

13  68.     On April 22, 2022, GILL was observed on surveillance video at the Elk

14  Grove Walgreens purchasing Uber gift cards. Based on the surveillance video, GILL paid

15  cash for the gift cards.

16
17
18
19
20
21
22



23  69.     The above-noted Uber gift card purchases, as confirmed by GILL in his post-

24  arrest statement, relate to a split border trip involving Uber Accounts 1 and 2 on the

25  morning of April 22, 2022. According to Uber records, this split trip originated at or near

26  Delta Line Road in Blaine, WA, and terminated approximately .2 miles from the Lacey

27  Residence.

AFFIDAVIT OF DAVID SPITZER - 16
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

70.     Based upon the above, I believe that GILL withdrew cash from Iknaam Acct -1219 to pay for Uber gift cards that he used in furtherance of the noncitizen smuggling conspiracy.

**F.     Arrest of Jaspal GILL and Post-Arrest Statement on May 24, 2022**

72.     On May 24, 2022, pursuant to a federal arrest warrant, HSI Blaine and HSI Tacoma agents arrested GILL at the Lacey Residence. One noncitizen that the noncitizen organization had smuggled into the United States in the preceding days was also encountered at the Lacey residence.

73.     During a recorded post-*Miranda* interview, GILL admitted that he became involved in international human smuggling no later than 2018. GILL stated that prior to 2018, he only assisted Indian nationals with getting on a bus (Greyhound) or train (Amtrak) once they had successfully made their way into the United States.

74.     GILL stated that the travel agents in India coordinated the travel of the noncitizens from India to Surrey, British Columbia, Canada. Once in British Columbia, a Canadian-based co-conspirator (hereafter "Co-conspirator 1") transported and housed them.

75.     Regarding the structure of the smuggling organization, GILL stated that he was the only one that operated in the United States. When asked how many Uber accounts he had, GILL stated "there is a lot of them". GILL admitted to controlling at least 10-15 Uber accounts. GILL further acknowledged the split-trip Uber scheme, *i.e.*, breaking border trips at an intermediate location such as Sea-Tac Airport.

76.     According to GILL, Co-conspirator 1 was in charge of payment, and only informed GILL when his payment was available. GILL stated that he was reimbursed for expenses and was paid an additional $2,500 per person. GILL later admitted that his fee, on occasion was up to $4,000 per person.

77.     GILL stated that the smuggling organization is not his only means of income. GILL stated that he ran a trucking company, Iknaam Transport, with his friend, Major

AFFIDAVIT OF DAVID SPITZER - 17
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Singh (hereafter "M. Singh").[14] GILL stated that he has known M. Singh since at least 1997.

78.     According to GILL, Iknaam Transport was started in 2016. Because of GILL's lack of status in the United States, GILL asked his wife to be on the paperwork for the company. GILL stated that KAUR coordinates some of the routes and runs dispatch, but she was an employee of the company run by GILL and M. Singh.

79.     GILL stated that Iknaam Transport has seven trucks and five drivers. GILL explained that Iknaam Transport provides freight services to many companies, including Costco and Walmart. GILL stated that Iknaam Transport owns all of the trucks. GILL explained that the company would be notified of potential trucking contracts via a phone-based application.

80.     GILL stated that Iknaam Transport has reported approximately $500,000 – $600,000 in profits on their federal taxes. GILL admitted that the company makes more money than what they have claimed on their federal taxes. GILL stated that before the pandemic, Iknaam Transport was profitable. However, GILL claimed that since the pandemic, they were barely making enough to break even.[15] GILL claimed that neither M. Singh, nor KAUR were aware of GILL's role in the smuggling organization.

81.     GILL further discussed the immigration bond scheme that the smuggling organization utilized. GILL admitted generating fraudulent bond documents that were submitted to the immigration court in support of bonds for the undocumented noncitizens detained at the Northwest ICE Processing Center. GILL admitted to sending these fraudulent bond documents in a .pdf format via text message to J.L., an immigration

---

[14] M. Singh is the President of Icon Freight Logistics, *i.e.*, the company/employer listed on the fraudulent Form 1099 sent by GILL via the **TARGET ACCOUNT** in February 2022. *See supra*, ¶¶ 37-38.

[15] According to records submitted by Iknaam Transport for the purpose of obtaining a PPP Loan, Iknaam Transport reported gross income in the following amounts: $533,166 (2019), $764,535 (2020), and $978,702 (2021). This reported increase in income is entirely inconsistent with GILL's statement that Iknaam Transport's revenues had decreased since the beginning of the pandemic.

AFFIDAVIT OF DAVID SPITZER - 18
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

attorney in Washington State. In exchange for immigration services, GILL stated that he paid the attorney approximately $1,000 per person via Zelle.[16]

### H.    Interview of Daljit KAUR on May 24, 2022

82.    Investigators served a search warrant at the Elk Grove residence on the morning of May 24, 2022. Daljit KAUR was present at the residence at the time of warrant execution. After being advised of her *Miranda* rights, KAUR agreed to speak with investigators.

83.    When asked about GILL, aka Rajinder Pal SINGH, KAUR identified him as "my kids' father". KAUR stated that GILL is unemployed. KAUR stated that GILL does not work as he is not legally allowed to and likewise does not contribute any money to the household.

84.    KAUR said that the trucking business she owns is called Iknaam Transport. According to KAUR, the company started in 2014 with one truck. KAUR stated that a family friend, M. Singh, also has a trucking company called Icon Freight. KAUR also stated that she operates the business from an office in the Elk Grove residence. KAUR stated that Iknaam Transport operates four trucks and Icon Freight operates three trucks. When asked where the trucks are parked when they are not in operation, KAUR stated that four are parked in a truck yard in Fresno, California, but she did not know the exact location.

85.    When questioned about the details of Iknaam Transport, KAUR stated that she is not involved in the day-to-day business and that M. Singh operates the business. KAUR further indicated that M. Singh maintained the paperwork for Iknaam Transport and that he would know the exact details of the kinds of loads that Iknaam Transport hauls. Regarding business-related payments from Iknaam Acct -1219, KAUR stated that M.

---

[16] In January 2020, Iknaam Acct -1219 checks were written to J.G. ($2,000) and J.L. ($5,000), who are both are immigration lawyers in the Seattle/Puget Sound area. Furthermore, on October 20, 2021, Iknaam Acct -1219 was used to make a Zelle transfer to J.L. in the amount of $2,500.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Singh would send her a message to pay an employee and she would then make a payment from her account.

86.     KAUR was also asked about certain suspicious deposits that had been made into Iknaam Acct -1219. KAUR explained that some of this money was sent by individuals living in India. KAUR explained that when money is sent [to her] from India, it would sometimes be sent to other individuals and their spouses before the funds are ultimately given to her. Investigators asked KAUR why money would go to a third party before being put into Iknaam Acct -1219. KAUR stated that she would explain, but asked, "why right now?" During the remainder of the interview, KAUR did not provide an explanation.

87.     When asked about who actually runs Iknaam Transport, KAUR stated that she is the owner and operator. When confronted with statements from GILL, *i.e.*, that he is the owner/operator of Iknaam Transport, KAUR insisted that GILL only helped with the business.

**I.     Indictment of Rajinder Pal SINGH, aka Jaspal GILL**

88.     On June 1, 2022, a Grand Jury in the Western District of Washington charged Rajinder Pal SINGH, aka Jaspal GILL, in a one-count indictment alleging the offense of Conspiracy to Transport and Habor Certain Aliens for Profit, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), (ii), and (iii), and 1324(a)(1)(B)(i).

**J.     Additional Analysis of Iknaam Acct -1219 and Suspected Use of Account in Furtherance of Target Offenses**

89.     Analysis of the credits to Iknaam Acct -1219 showed that the account received deposits from varying sources in the form of checks, out of state in-branch deposit, mobile deposits, teller transfers, and electronic transfers from more businesses and individuals. Though some of the deposits into Iknaam Acct -1219 may relate to legitimate commercial trucking activities, investigators noted that many of the deposits were suspicious in nature because they exhibited many of the following characteristics: were made in person by Jaspal GILL, were made in-branch—often at locations outside of

California—by individuals with no apparent commercial relationship with Iknaam Transport, were in round-dollar amounts, were made via cash, money order, or cashier's check with no purchaser listed, were in amounts consistent with the smuggling fees charged by the organization, and/or were made close in time to a suspected smuggling event.

**Suspicious Deposit History Begins Upon Account Opening**

90.     Though prior to the initiation of the instant investigation, suspicious credits into Iknaam Acct -1219 began almost immediately upon account opening. For example, on September 8 and September 9, 2015—approximately two months after account opening—there were four separate cash deposits into Iknaam Acct -1219. These cash deposits totaled $9,532, *i.e.*, just under $10,000, the amount which would trigger a currency transaction report.[17] While there do not appear to be any business-related expenses for the account during September 2015, there are multiple transfers from Iknaam Acct -1219 to personal accounts held by Daljit KAUR.

91.     Similar activity was observed on January 11, 2016, when a deposit of $9,835 was made to Iknaam Acct -1219. This deposit consisted of a personal check in the amount of $3,035 from Pushpa Prajapati and cashier's checks in the amount of $3,800 and $3,000. Of note, both cashier's checks[18] were dated January 5, 2016, both were issued by a Wells Fargo Bank in New Jersey, and neither listed a purchaser.

**Suspicious Deposit Activity into Iknaam Acct -1219 Increases and Appears to Relate to Known Smuggling Events**

92.     In September 2019, there were fourteen in-branch or ATM deposits—totaling $193,980—credited to Iknaam Acct -1219.[19] Based on surveillance images

---

[17] *See* 31 CFR 1010.300, *et seq.*

[18] Based upon my training and experience, I know that alternative monetary instruments, such as money orders and cashier's checks, are often utilized as a means of obscuring the nature and/or source of illicit proceeds.

[19] According to 2019 tax returns submitted as part of a Paycheck Protection Program loan submitted by Iknaam Transport in March 2021, Iknaam Transport had gross income of 533,166 in 2019.

AFFIDAVIT OF DAVID SPITZER - 21
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

obtained from Bank of America, GILL made six of these deposits. The deposits made by GILL totaled $106,480.

93.     Of the other eight deposits, one was a $10,000 deposit made on September 11, 2019, in Bluffton, South Carolina. The check was written on a Bank of America account in the name of Govindbhai Patel. The address on the check was 1420 New Bellevue Avenue, Apt. 1410, Daytona Beach, Florida. However, the address is crossed out and no other address is written on the check.

94.     Based on records previously obtained from Uber, investigators know that there was a split Uber trip that originated near the US – Canada border on September 10, 2019. Specifically, at 4:09 a.m., an Uber trip, ordered by an account controlled by GILL, was picked up from Hovel Road in Sumas, Washington—which is two miles south of the U.S. – Canada border. The trip was split in SeaTac, WA, and the second leg of the trip concluded at an address next door to a stash house in Kent, Washington, that GILL confirmed was used by the organization to house noncitizens prior to transport to other locations within the United States.

95.     Based on my experience with this case, as well as my experience in human smuggling investigations, I believe that the $10,000 deposit on September 10, 2019, was payment for human smuggling activity arranged by GILL. I base this belief on a number of factors, including that the deposit happened the day after a known smuggling event, the individual who issued the check had no apparent business relationship with Iknaam Transport, the check amount was consistent with the fee that GILL has charged for his smuggling services (*supra* at ¶30), and the round-dollar nature of the check is inconsistent with payment for commercial services, *i.e.*, freight services provided by a legitimate trucking company.

96.     Moreover, during the month of September 2019, there were additional suspicious checks deposited into Iknaam Acct -1219. Specifically, checks (in round-dollar amounts) were also written from individuals in Utah ($5,000), Wisconsin ($7,000), and

AFFIDAVIT OF DAVID SPITZER - 22
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Illinois ($16,000). GILL deposited two of those three checks. An unknown individual, at a Bank of America branch in Bolingbrook, Illinois, was observed depositing the third check. Significantly, Bolingbrook is a suburb of Chicago, which based upon my investigation in this case—to include statements made by GILL during his post-arrest interview on May 24, 2022—I know to be the ultimate destination for most of the noncitizens smuggled by this organization.

97.     Based on my investigation in this case, as well as my experience in human smuggling investigation, I believe that these deposits represent payments for smuggling services provided by GILL and the larger smuggling organization.

**Suspicious Deposit Activity into Iknaam Acct -1219 Continues into late 2021 and Early 2022**

98.     On September 4, 2021, a cash deposit of $9,900 was made to Iknaam Acct -1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in Seminole, Florida.

99.     On September 7, 2021, a counter deposit was credited to Iknaam Acct -1219 totaling $12,500. This deposit was made utilizing two checks apparently from the same person, but from different banks. The first check ($6,000) was written on a Bank of America account belonging to Harshal Soni. The second check ($6,500) was written on a Regions Bank account also belonging to Harshal Soni. Both checks listed the same address for the account holder of the respective accounts. The deposit was made in-branch at a Bank of America banking center in O'Fallon, Illinois.

100.    On October 4, 2021, a counter deposit was credited to Iknaam Acct -1219 totaling $10,000. This deposit consisted of two credits: $9,800 in cash and a $200 Money Order. This deposit was made by an unknown person in-branch at a Bank of America banking center located in Centerville, Georgia, which is just outside of Macon, Georgia.

//

//

AFFIDAVIT OF DAVID SPITZER - 23
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

101.    On October 7, 2021, a cash deposit of $9,800 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in Macon, Georgia.

102.    On October 8, 2021, a cash deposit of $9,800 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in a suburb of Los Angeles, California.

103.    On October 12, 2021, a cash deposit of $9,800 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in St. Petersburg, Florida.

104.    On October 21, 2021, a cash deposit of $9,500 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in Warner Robbins, Georgia, which is just outside of Macon, Georgia. This branch is approximately one mile from the Centerville, Georgia branch referenced above.

105.    On November 1, 2021, a cash deposit of $9,800 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at the same Macon, Georgia Bank of America in which a $9,800 deposit was made on October 7, 2021.

106.    On November 2, 2021, a cash deposit of $9,900 was made to Iknaam Acct - 1219. This deposit was made by an unknown person in-branch at a Bank of America banking center located in Atlanta, Georgia.

107.    On January 3, 2022, a $5,000 check deposit was made to Iknaam Acct -1219. The check was written on a Town and Country Bank and Trust Co. account check, was dated December 13, 2021, and the check number was 336. The account holder was "Jay Hospitality" in Bardstown, Kentucky. The memo line on the check indicated that the check was for "babubhai." I know that the word "bhai" in Hindi means "brother." A second check written on the same account, in the same amount, was also deposited into Iknaam Acct - 1219 on January 3, 2022. This check, check number 338, was also dated December 13,

AFFIDAVIT OF DAVID SPITZER - 24
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2021, and had the same notation—"Babubhai"—in the memo section. Though the account holder appears to be a business, the memo is not consistent with payment for legitimate freight services.

108.   Based on my investigation in this case, as well as my experience in human smuggling investigations, I believe that cash and check deposits referenced in this section represent payments for smuggling services provided by GILL and the larger smuggling organization.

109.   In August 2022, Bank of America provided account records for Iknaam Acct -1219 for the period April 2022 through June 2022. A review of the account activity shows an immediate stop to teller transfers, out of state deposits, round dollar amount deposits, and deposits just under the reporting requirements into Iknaam Acct -1219 following GILL's arrest on May 24, 2022.

110.   In sum, investigators have identified Iknaam Transport as a potential front business used by members of the conspiracy both as a mechanism to pay for expenses associated with the smuggling conspiracy, and as a means of legitimizing the illicit proceeds of the noncitizen smuggling conspiracy. I therefore believe that a search of **TARGET ACCOUNT** will provide evidence, fruits, and instrumentalities the Target Offenses. I also believe that the **TARGET ACCOUNT** will provide evidence, or a lack thereof, of actual business operations, manifests, order history, and customer communication. Given that Iknaam Transport appears to be operating, at least in part, as a front company for the smuggling organization, the absence of such information would serve as evidence that Iknaam Transport was used by GILL, and others, as a means to facilitate and commit the Target Offenses.

111.   On May 10, 2022, I sent a preservation letter to Google, Inc. ("Google") pursuant to 18 U.S.C § 2703(d) requesting preservation of information associated with the **TARGET ACCOUNT**. On August 29, 2022, I sent a preservation letter extension to Google to continue preserving the information previously requested on May 10, 2022. In

AFFIDAVIT OF DAVID SPITZER - 25
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google servers for a certain period of time.

## BACKGROUND CONCERNING GOOGLE'S SERVICES

112. In my training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access and instant messaging (otherwise known as "chat" messaging), to the general public. Google provides subscribers e-mail and chat accounts at the domain name "@gmail.com. Google also allows subscribers to register a custom domain name and set up Google serveices such as chat and email using that domain name instead of "@gmail.com."

## Subscriber Records and Account Content

113. Subscribers obtain an account by registering with Google. When doing so, email providers like Google ask the subscriber to provide certain personal identifying information. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users, and to help establish who has dominion and control over the account.

114. Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's websites), and other log files that reflect usage of

AFFIDAVIT OF DAVID SPITZER - 26
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the account. In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

115. In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

116. In general, an email that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google's servers until the subscriber deletes the email. When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Google servers, and then transmitted to its end destination. Google often maintains a copy of received and sent emails. Unless the sender specifically deletes an email from the Google server, the email can remain on the system indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for some period of time.

117. A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

118. In addition to email and chat, Google offers subscribers numerous other services including: Android, Blogger, Google Alerts, Google Calendar, Google Chrome

AFFIDAVIT OF DAVID SPITZER - 27
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sync, Google Cloud Print, G-Suite, Google Developers Console, Google Drive, Google Hangouts, Google Maps, Google Payments, Google Photos, Google Search Console, Google Voice, Google+, Google Profile, Location History, Web & Activity, Search, and YouTube, among others. Thus, a subscriber to a Google account can also store files, including address books, contact lists, calendar data, photographs and other files, on servers maintained and/or owned by Google. For example, Google Calendar is a calendar service that users may utilize to organize their schedule and share events with others. Google Drive may be used to store data and documents, including spreadsheets, written documents (such as Word or Word Perfect) and other documents. Google Photos can be used to create photo albums, store photographs, and share photographs with others and "You Tube," allows users to view, store and share videos. Google Search Console records a Google account user's search queries. And Google Web & Activity records certain browsing history depending on whether the account holder is logged into their account. Like many internet service companies (including the companies discussed below), the services Google offers are constantly changing and evolving.

119.    Based upon my training and experience, all of these types of information may be evidence of crimes under investigation. Stored communications, documents, and Google account activity not only may contain evidence of the crimes, but also help identify the participants in those crimes. For example, address books and contact lists may help identify both the owner of the account and locate co-conspirators. Similarly, photographs and videos stored in the account may help identify the account owner's true identity, as opposed to supposed identities that he/she has used in telephone or email communications. Documents (such as Google sheets used to store the victims' personal identifying information or harassment efforts), may identify the scope of the criminal activity. And calendar data may reveal the timing and extent of criminal activity. Search and browsing history can also be extremely useful in identifying those using anonymous online accounts and may also constitute direct evidence of the crimes under investigation to the extent the

AFFIDAVIT OF DAVID SPITZER - 28
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

browsing history or search history might include searches and browsing history related to compromising online accounts, identifying the victims, and other evidence of the crimes under investigation or indications of the true identity of the account user(s).

120. Google is also able to provide information that will assist law enforcement in identifying other accounts associated with the **TARGET ACCOUNT**, namely information identifying and relating to other accounts used by the same subscriber. This information includes any forwarding or fetching accounts[20] relating to the **TARGET ACCOUNT**, all other Google accounts linked to the **TARGET ACCOUNT**, because they were accessed from the same computer (referred to as "cookie overlap"), all other Google accounts that list the same SMS phone number as the **TARGET ACCOUNT**, all other Google accounts that list the same recovery email addresses[21] as does **TARGET ACCOUNT**, and all other Google accounts that share the same creation IP address as the **TARGET ACCOUNT**. Information associated with these associated accounts will assist law enforcement in determining who controls the **TARGET ACCOUNT** and will also help to identify other email accounts relevant to the investigation.

### Google Location History and Location Reporting

121. According to Google's website, "Location Reporting" allows Google to periodically store and use a device's most recent location data in connection with the Google Account connected to the device. "Location History" allows Google to store a history of location data from all devices where a user is logged into their Google Account and have enabled Location Reporting. According to Google "[w]hen you turn on Location Reporting for a device like your iPhone or iPad, it lets Google periodically store and use that device's most recent location data in connection with your Google Account." How

---

[20] A forwarding or fetching account related to the **TARGET ACCOUNT** would be a separate email account that can be setup by the user to receive copies of all of the email sent to the **TARGET ACCOUNT**.
[21] The recovery email address is an additional email address supplied by the user that is used by Google to confirm the username after you create an email account, help you if you are having trouble singing into your Google account or have forgotten your password, or alert you to any unusual activity involving the user's Google email address.

often Location Reporting updates location data is not fixed. Frequency is determined by factors such as how much battery life the device has, if the device is moving, or how fast the device is moving. Google's location services may use GPS, Wi-Fi hotspots, and cellular network towers to determine an account holder's location.

122.   Based on the above, I know that if a user of the **TARGET ACCOUNT** utilizes a mobile device to access the respective account identified in Attachment A, and has not disabled location services on his or her device/s or through the Google account settings, Google may have detailed records of the locations at which the account holder(s) utilized the mobile device(s). This type of evidence may further assist in identifying the account holder(s), and lead to the discovery of other evidence of the crimes under investigation.

123.   I know that Google's Android service collects and stores identifying information about an Android smart phone used to access the Google account, including the International Mobile Equipment Identifier (IMEI), International Mobile Subscriber Identity (IMSI), telephone number and mobile carrier code. In addition, Google may collect and store certain data related to applications used on Android smart phones, and in certain instances, Google may allow a user to backup settings, app data, communications, and other data stored on an Android device. I know that Google's Location History service periodically queries the physical location of a device that is currently accessing a Google account through the device's GPS, nearby Wi-Fi network IDs and cellular tower information and records a history of device movements in Google's servers. Because the criminal actor(s) behind this harassment campaign have made a concerted effort to disguise their real location, I am requesting Google to provide information from the Android service and Location History service from the **TARGET ACCOUNT**, in order to more accurately identify the location and phone number of the person responsible for the **TARGET ACCOUNT**.

AFFIDAVIT OF DAVID SPITZER - 30
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

124.   Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit Google, and their agents and employees, to assist agents in the execution of this warrant. Once issued, the search warrant will be presented to Google with direction that it identify the Google account described in Attachment A, as well as other subscriber and log records associated with the accounts, as set forth in Section I of Attachments B to this affidavit.

125.   The search warrant will direct Google to create an exact copy of the **TARGET ACCOUNT** and records.

126.   I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to Attachment B for seizure.

127.   Analyzing the data contained in the forensic image may require special technical skills, equipment, and software. It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text. The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well. Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. All forensic analysis of the data will employ only those search protocols and methodologies reasonably

AFFIDAVIT OF DAVID SPITZER - 31
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  designed to identify and seize the items identified in Section II of Attachment B to the

2  warrant.

3      128.   Based on my experience and training, and the experience and training of

4  other agents with whom I have communicated, it is necessary to review and seize a variety

5  of email communications, chat logs and documents, that identify any users of the subject

6  account and e-mails sent or received in temporal proximity to incriminating e-mails that

7  provide context to the incriminating communications.

8  **CONCLUSION**

9      129.   Based on the forgoing, I request that the Court issue the proposed search

10  warrant.

11      130.   Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant

12  by serving the warrant on Google. Because the warrant will be served on Google, who will

13  then compile the requested records and data, reasonable cause exists to permit the

14  execution of the requested warrant at any time in the day or night. Accordingly, by this

15  Affidavit and Warrant, I seek authority for the government to search all of the items

16  specified in Section I, Attachment B (attached hereto and incorporated by reference herein)

17  to the Warrant, and specifically to seize all of the data, documents and records that are

18  identified in Section II to that same Attachment.

19

20      Respectfully submitted,

21

22      DAVID SPITZER

23      Special Agent
       Homeland Security Investigations

24

25

26

27

AFFIDAVIT OF DAVID SPITZER - 32
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on this 28th day of October, 2022.

HON. PAULA L. MCCANDLIS
United States Magistrate Judge

AFFIDAVIT OF DAVID SPITZER - 33
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## ATTACHMENT A

### Account to Be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with **iknaamtransport@gmail.com** ("**TARGET ACCOUNT**"), which is stored at a premises controlled by Google, LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway in Mountain View, California.

ATTACHMENT A - 1
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Google, LLC:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, LLC ("Google"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Google is required to disclose the following information to the government for each Account or identifier listed in Attachment A, from **August 1, 2018**, through **May 24, 2022**:

a.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

b.     All forwarding or fetching accounts relating to the accounts;

c.     All subscriber records associated with the **TARGET ACCOUNT**, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

d.     Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user

ATTACHMENT B - 1
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   belongs or communicates with; user settings; and all associated logs and change history;

2         e.    Any records pertaining to the user's calendar(s), including: Google Calendar

3   events; Google Tasks; reminders; appointments; invites; and goals; the sender and

4   recipients of any event invitation, reminder, appointment, or task; user settings; and all

5   associated logs and change history;

6         f.    The contents of all records associated with the account in Google Drive

7   (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders,

8   media, notes and note titles, lists, applications, and other data uploaded, created, stored, or

9   shared with the account including drafts and deleted records; third-party application data

10  and backups; SMS data and device backups; the creation and change history of each record;

11  accounts with access to or which previously accessed each record; any location, device,

12  other Google service (such as Google Classroom or Google Group), or third-party

13  application associated with each record; and all associated logs, including access logs and

14  IP addresses, of each record;

15        g.    All maps data associated with the account, including Google Maps and

16  Google Trips, including: all saved, starred, and privately labeled locations; search history;

17  routes begun; routes completed; mode of transit used for directions; My Maps data;

18  accounts and identifiers receiving or sending Location Sharing information to the account;

19  changes and edits to public places; and all associated logs, including IP addresses, location

20  data, and timestamps, and change history;

21        h.    The contents of all media associated with the account in Google Photos,

22  including: photos, GIFs, videos, animations, collages, icons, or other data uploaded,

23  created, stored, or shared with the account, including drafts and deleted records; accounts

24  with access to or which previously accessed each record; any location, device, or third-

25  party application data associated with each record; and all associated logs of each record,

26  including the creation and change history, access logs, and IP addresses;

27

ATTACHMENT B - 2
USAO #2018R00962

i.     The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

j.     All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history;

l.     All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history;

m.     all Android content, including, but not limited to active content and backups;

n.     all account history, including any records of communications between Google and any other person about issues relating to the accounts, such as technical problems, billing inquiries, or complaints from other users about the **TARGET ACCOUNT**. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber in connection with the service.

ATTACHMENT B - 3
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Google is hereby ordered to disclose the above information to the government within **14**

2   **days** of service of this warrant.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ATTACHMENT B - 4
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of the "Target Offenses", those violations occurring between **August 1, 2018**, and **May 24, 2022**, including, for the account or identifier listed on Attachment A, information pertaining to the following matters:

a.     Evidence indicating the identities of individuals smuggled into the United States and/or the identities of co-conspirators involved in the smuggling of people into the United States;

b.     Evidence indicating payments received for smuggling and/or harboring of undocumented noncitizens, including transportation, lodging, and employment;

c.     Evidence pertaining to alien smuggling or alien harboring;

d.     Evidence pertaining to the physical location of co-conspirators, including photographs, correspondence, or other evidence indicating the location of co-conspirators during known human smuggling events;

e.     Evidence pertaining to document fraud, document procurement, or use of false identities by GILL and/or other individuals, which would allow them to evade detection of their unlawful presence in the United States;

f.     Evidence indicating how and when the **TARGET ACCOUNT** was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

g.     Evidence indicating the **TARGET ACCOUNT** owner's state of mind as it relates to the crimes under investigation;

h.     The identity of the person(s) who created or used the **TARGET ACCOUNT**, including records that help reveal the whereabouts of any unknown person(s);

ATTACHMENT B - 1
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

i.      The identity of the person(s) who communicated with the **TARGET ACCOUNT** about matters related to alien smuggling or harboring and related financial transactions including records that help reveal their whereabouts.

j.      Any information related to the recipients and senders of monetary instruments;

k.      Any information regarding financial transactions, including the transfer of funds through bank accounts, or the conversion of those funds to other assets;

n.      Any information regarding opening bank accounts, bank records, checks, credit card bills, account information, and other financial records;

o.      Any information related to the recipients and senders of monetary instruments, including Iknaam Transport;

p.      All messages, documents, and profile information, attachments, or other data that serves to identify any persons who use or access the **TARGET ACCOUNT**, or who exercise in any way any dominion or control over the **TARGET ACCOUNT**;

q.      All subscriber records associated with the **TARGET ACCOUNT**, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service) including any credit card or bank account number;

r.      Any log records, including IP address captures, associated with the **TARGET ACCOUNT**;

s.      any records of communications between **Google,** and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the **TARGET ACCOUNT**. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

ATTACHMENT B - 2
USAO #2018R00962

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO

### FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google LLC **AND/OR** Google Payment Corporation ("Google"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google. The attached records consist of

_____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b.     such records were generated by Google's electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                      Signature